UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES L BLAYLOCK,

    Plaintiff,                                                   Case No. 22-cv-10831

v.

                                                            Hon. Sean F. Cox

ADAMS et al.,                                    United States District Court Judge

    Defendants.

_____/

**OPINION & ORDER**
**DENYING DEFENDANTS' MOTIONS FOR A DIRECTED VERDICT (Dkt. No. 95, 99)**

Plaintiff James Blaylock was in the custody of the Michigan Department of Corrections ("MDOC") at the St. Louis Correctional Facility ("SLF") in Michigan at all times relevant to this action.  Blaylock sought damages from SLF's warden, Becky Carl, and assistant deputy warden, Andrew Dyer (together, "Defendants"), under 42 U.S.C. § 1983 for violating his due-process rights by confining him in administrative segregation for nearly three months without adequate review.

Defendants moved for summary judgment, and the Court denied that motion.  Trial was held in April 2025, and the parties were the only witnesses.  Defendants orally moved for judgment as a matter of law after the close of the evidence (Dkt. No. 95), and the Court declined to rule on that motion and submitted the case to the jury.  The jury found Defendants liable and awarded nearly $200,000 in damages, and Defendants now renew their motion for judgment as a matter of law.  (Dkt. No. 99).  For the following reasons, the Court denies Defendants' motions.

1

# BACKGROUND

### I. SLF's Segregation Policies

The jury was shown MDOC policies regarding segregation that applied to SLF officers at the relevant time. (Joint Ex. 6, Mich. Dep't of Corr., Pol'y Directive 04.05.120, Segregation Standards (eff. June 1, 2019) [hereinafter Segregation Policy]; Joint Ex. 10, Mich. Dep't of Corr., Pol'y Directive 03.03.105, Prisoner Discipline (eff. July 1, 2018) [hereinafter Discipline Policy]). These policies distinguish "punitive" segregation from "administrative" segregation. (Segregation Policy 3 ¶ Q, 5 ¶ Z). A prisoner may only be placed in punitive segregation "to serve a detention sanction for a Class I misconduct" following a hearing before an administrative law judge ("ALJ"). (*Id.* at 5 ¶ Z). And a prisoner must "be removed from punitive segregation immediately upon termination of the detention sanction." (*Id.* at 12 ¶ NNN).

Administrative segregation works differently. A prison's security classification committee ("SCC") may place a prisoner in administrative segregation if, among other things, he or she "demonstrates an inability to be managed with general population privileges." (*Id.* at 3 ¶ Q(1)). And "[a] prisoner may be reclassified to administrative segregation based solely on a Class I misconduct guilty finding without a separate hearing being conducted" before an ALJ. (Discipline Policy 13 ¶ DDDD; *see also* Segregation Policy 4 ¶ U).

Unlike punitive segregation, administrative segregation does not automatically end. "A prisoner classified to administrative segregation remains in that classification . . . until s/he is reclassified." (Segregation Policy 2 ¶ I). And prison officials must consider four factors to determine whether to release a prisoner from administrative segregation: (1) "the circumstances that necessitated segregation as well as any history of prior behavior that also required segregation"; (2) whether "the prisoner's behavior and attitude while in segregation" is

"consistent with the behavior and attitude of prisoners in the general population"; (3) "the prisoner's potential to honor the trust implicit in less restrictive confinement"; and (4) "the prisoner's need for correctional mental health services." (*Id.* at 12 ¶ LLL).

Although a prisoner who is classified to administrative segregation for a Class I misconduct is not entitled to a second hearing before an ALJ, MDOC's policies require some review. A housing-unit team must review all administrative segregations within seven days of their commencement. (*Id.* at 11 ¶ FFF). The warden must approve all administrative segregations that last longer than thirty days. (*Id.* at 12 ¶ HHH). A prison's SCC must review all administrative segregations every thirty days and conduct "an out-of-cell personal interview" with the prisoner. (*Id.* at 11 ¶ FFF). And if a prisoner "chooses not to participate in the review," then "the highest ranking SCC member [must] personally visit the prisoner to encourage his/her participation." (*Id.*).

## II.   Blaylock's Administrative Segregation

Blaylock was found guilty of two Class I misconducts following a hearing before an ALJ in July 2021. The ALJ found Blaylock guilty of "Assault and Battery" for "hit[ting] Officer Rodarte in the head with a closed fist during cell rush" with "intent[] to injure" on July 14, 2021. (Joint Ex. 2). The ALJ also found Blaylock guilty of "Threatening Behavior" for "walk[ing] up to Officer Agbor within 4 feet with a scowl and sa[ying] 'Agbor you aren't closing the yard because someday you gonna get hurt, I will jump on you,'" also on July 14, 2021. (Joint Ex. 3). The ALJ sentenced Blaylock to twenty days of punitive segregation for these offenses, and Blaylock began that sentence on July 22, 2021.

Blaylock's punitive-segregation sentence ended on August 11, 2021. That same day, SLF's SCC (of which Dyer, SLF's assistant warden, was the highest-ranking member) reclassified Blaylock to administrative segregation.

A Security Reclassification Notice signed by Dyer states why Blaylock was reclassified. The Notice states that Blaylock's July 22, 2021, convictions for "Assault & Battery (Staff Victim)" and "Threatening Behavior" showed that he was "[u]nab[le] to be managed with general population privileges."[1] (Joint Ex. 7). And Dyer testified that Blaylock had been reclassified "based on the fact that he assaulted an officer." (Dkt. No. 98, at 640).

Blaylock would remain in administrative segregation until November 3, 2021. MDOC's policies state that "[a]dministrative segregation is the most restrictive level of security classification." (Segregation Policy 3 ¶ Q). Blaylock testified that, unlike when he was in general population, he could not watch television or speak to anyone in administrative segregation, and he was only allowed to leave his administrative-segregation cell for one hour each day for "yard time" in a six-foot-wide cage. (Dkt. No. 98, at 567–70). Dyer, however, testified that administrative segregation is in some respects less restrictive than punitive segregation because prisoners are allowed to have some personal belongings. (*Id.* at 649–50). Blaylock also testified that he tried to commit suicide a month after he was released from administrative segregation due to the trauma of his confinement. (*Id.* at 575).

SLF's housing-unit team reviewed Blaylock's administrative segregation on August 18, 2021, and memorialized the review in a Segregation Behavior Review form. The form details that Blaylock was administratively segregated for "Inability to Be Managed With GP Privileges."

---

[1] The Notice also lists an April 2021 Class I misconduct conviction for "Interference with the Administration of Rules" (Joint Ex. 7), but the jury did not hear any evidence about this conviction.

4

(Joint Ex. 8A). The form also contains a section for the housing-unit team to record whether Blaylock's "behavior and attitude" towards staff and other prisoners was "never," "rarely," "sometimes," or "regularly" "appropriate"; and whether his "housekeeping and personal hygiene" was "poor," "adequate," or "good." (*Id.* (capitalization normalized)). The form states that Blaylock's behavior and attitude towards both staff and prisoners was regularly appropriate and that his housekeeping and personal hygiene were adequate.

SLF's SCC periodically reviewed Blaylock's administrative segregation on September 8, October 6, and November 3, 2021, and the reviews were memorialized in three Segregation Behavior Review forms signed by Dyer and Carl. Dyer participated in those reviews as a member of SLF's SCC. And he testified that "[e]very time [he] sat up and did a classification review, [he] reviewed the prisoner's file, [he] reviewed what they're in there for, the misconducts, the previous misconducts they may have had, and any other time they may have been in administrative segregation and for what reasons." (Dkt. No. 98, at 646).

The September review form states the following in a box labeled "Nature of What Led to Segregation": "Prisoner punched Officer Rodarte in the head and stated to officer Agbor 'you aren't closing the yard because someday you gonna get hurt, I will jump on you.'" (Joint Ex. 8B). The form also states that Blaylock was interviewed and contains the following text in a box labeled "Prisoner Comment": "I was going to the hole when someone lied. I had an issue w/ the yard closing early." (*Id.*). The form additionally contains boxes labeled "Continue Segregation" and "Reclassify to General Population." (*Id.*). The former box is blank, and an "x" is written on the latter box. (*Id.*). The form further states, "serious misconducts," in a box labeled "Reason for Continued Segregation." (*Id.*). And the form lists the same behavior and hygiene scores as the August review form.

Dyer and Blaylock testified about Blaylock's September interview. Dyer said that he conducted the interview, and that Blaylock refused to take responsibility for his July 2021 misconduct convictions. (Dkt. No. 98, at 664). For his part, Blaylock testified that during the interview he told Dyer "that someone lied, that the officer lied and said I threatened him and I had an issue with the yard closing." (*Id.* at 558).

Like the September review form, the October review form lists the facts that led to Blaylock's July 2021 misconduct convictions and recommends that his administrative segregation be continued for "seriousness of misconduct." (Joint Ex. 8C). The form also states that Blaylock was interviewed, and the "Prisoner Comment" section of the form states, "my due process was violated." (*Id.*). And the form lists the same scores for behavior and hygiene as the August and September review forms.

Dyer and Blaylock also testified about Blaylock's October interview. Dyer stated that he also conducted that interview, and that Blaylock again refused to take responsibility for his July 2021 misconduct convictions. (Dkt. No. 98, at 664). And Blaylock testified that the interview lasted thirty seconds, and that he complained to Dyer that his due-process rights were being violated. (*Id.* at 561–63).

The November review form is less straightforward than the September and October review forms. As with the September and October review forms, the November form lists the facts that led to Blaylock's July 2021 misconduct convictions. The form also states that Blaylock refused to participate in an interview because he "[d]idn't want to argue," and the "Prisoner Comment" section of the form states, "I just did not want to argue. I tried to explain myself last time and I ended up getting upset. I apologize." (*Id.*). An "x" is marked on the box labeled "Continue Segregation," but a check mark is written on the box labeled "Reclassify to General

6

Population." (*Id.*). The text "serious nature of misconduct" was written in the "Reason for Continued Segregation" box, but that text was crossed out and the text "(GRAD)" was written next to it.[2] (*Id.*). The form also lists the same scores for behavior and hygiene as the earlier review forms. And Blaylock was released from administrative segregation on November 3, 2021, which is the same day that Dyer signed the November review form.

Dyer and Blaylock testified about what happened during the November review. Blaylock stated that he initially refused to be interviewed for the November review but relented after Dyer came to his cell segregation. (Dkt. No. 98, at 565–66). Dyer confirmed that he went to see Blaylock on November 3, 2021, and that Blaylock apologized for refusing to be interviewed and took responsibility for his July 2021 misconduct convictions. (*Id.* at 664). And Dyer stated that the SCC recommended Blaylock be released from segregation after that conversation. (*Id.* at 664).

Dyer also testified about why the SCC had recommended that Blaylock's administrative segregation be continued in September and October and changed its recommendation in November. Dyer said that the SCC twice recommended that Blaylock remain segregated because his July 2021 misconduct convictions were serious and Blaylock refused to take responsibility. (*Id.*). And Dyer said that the SCC recommended Blaylock be placed back in general population in November because his contrition on November 3, 2021, showed that he could be managed with general-population privileges again. (*Id.*).

### III. Blaylock's Medical History

Blaylock presented some evidence that he was mentally ill during his administrative segregation. Blaylock testified that he requested medical assistance while he was in

---

[2] The parties did not explain what "(GRAD)" means.

administrative segregation because he "believed the walls talk[ed] to him." (Dkt. No. 98, at 573). Blaylock testified that he was subsequently seen by SLF's medical staff five times, they refused to believe he was mentally ill, even after he provided relevant documentation. (*Id.* at 574–75). Blaylock also introduced a record dated July 14, 2021, incident that states that Blaylock told an SLF official that "he was 'hearing voices.'" (Joint Ex. 1). And Blaylock testified that he had been taking psychiatric medication before he was incarcerated and had not taken any such medication since he had entered MDOC custody. (*Id.* at 576–77). For their part, Defendants showed documents to the jury that they believed contradicted Blaylock's assertion that he was mentally ill during his administrative segregation.

## STANDARD OF REVIEW

Renewed motions for judgment as a matter of law are reviewed using the same standard as motions for judgment as a matter of law. *See* Fed. R. Civ. P. 50(b). In reviewing a motion for judgment as a matter of law, "[t]he trial judge does not weigh the evidence. Rather, the judge views the evidence, and inferences therefrom in the light most favorable to the nonmoving party." *Hersch v. United States*, 719 F.2d 873, 876–77 (6th Cir. 1983). And "[t]he trial court may only grant the directed verdict 'if there is a complete absence of pleading or proof on an issue or issues material to the cause of action or where there are no controverted issues of fact upon which reasonable men could differ.'" *Id.* at 877 (quoting *Rockwell Int'l Corp. v. Reg'l Emergency Medical Servs. of N.W. Ohio, Inc.*, 688 F.2d 29, 31 (6th Cir. 1982)).

## ANALYSIS

Blaylock pled that Defendants violated his due-process rights when they confined him in administrative segregation from August to early November 2021. As relevant to this claim, "States may under certain circumstances create liberty interests which are protected by the Due

8

Process Clause." *Sandin v. Connor*, 515 U.S. 472, 483–84 (1995). One such circumstance is when a State imposes on a prisoner some "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484 (citation omitted). And when a prisoner's administrative segregation fits this description, "prison officials must engage in some sort of periodic review," and "the officials' decision to continue such confinement must be supported by 'some evidence.'" *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (quoting *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012)).

Thus, Blaylock had to prove three things to prevail at trial: (1) that Defendants decided to continue his administrative segregation from August to early November 2021; (2) that the segregation was atypical and significant in relation to the ordinary incidents of prison life; and (3) that Defendants did not periodically review the segregation or else no evidence supported their decision to continue the segregation. Defendants argue that Blaylock failed to prove the second and third elements and that they are entitled to qualified immunity in any event.

I. **Protected Liberty Interest**

Defendants argue that Blaylock failed to prove that he had a protected liberty interest in remaining free from administrative segregation from August to early November 2021. According to him, the trial evidence did not show that Blaylock's segregation was atypically and significantly hard in relation to the ordinary incidents of prison life. Defendants believe that is true for three reasons, none of which are persuasive.

*First*, Defendants maintain that, as a matter of law, prisoners who are security risks have no protected liberty interest in being free from confinement under *any* conditions for the length

9

of time that Blaylock was in administrative segregation, and Blaylock was a security risk. In support of their position, Defendants selectively quote language from *Harris ex rel. J.H. v. Williamson County*, 951 F.3d 709 (6th Cir. 2020), which itself relied on *Bell v. Wolfish*, 441 U.S. 520 (1979): "The relevant question is whether the prisoner's placement in segregation was 'rationally related to a legitimate nonpunitive governmental purpose and whether [it] appear[s] excessive in relation to that purpose.'" (Dkt. No. 99, at 701 (alterations in original) (quoting *J.H.*, 951 F.3d at 717)).

Defendants' reliance on *J.H.* is misplaced. Per *Bell*, whether a governmental sanction is excessive in relation to its legitimate, nonpunitive purpose is relevant to whether the sanction "amount[ed] to punishment in the constitutional sense of that word." *Bell*, 441 U.S. at 538. And *Bell* instructs that this issue matters because "under the Due Process Clause, *a detainee* may not be punished *prior to an adjudication of guilt*." *Id.* at 535 (emphasis added). And *J.H.* applied this rule to a claim that prison officials placed a juvenile in segregation before any adjudication of delinquency. *See J.H.*, 951 F.3d at 709. *J.H.* does not help Defendants because it "dealt with the interests of pretrial detainees and not convicted prisoners." *Sandin*, 515 U.S. at 484.

*Second*, Defendants argue that Blaylock's administrative segregation was not atypically and significantly hard unless he was mentally ill during the segregation, and Blaylock failed to prove he was mentally ill. The Court disagrees. Whether the conditions of Blaylock's administrative segregation were atypically and significantly hard turns on whether they "present[ed] a dramatic departure from the basic conditions" of his sentence. *Id.* at 485. Blaylock's administrative segregation could have fit this description regardless of whether he was mentally ill.

And Blaylock presented sufficient evidence that his administrative segregation was atypically and significantly hard notwithstanding any mental illness. Blaylock testified that, unlike prisoners classified to general population, he could not watch television or speak to anyone and was only allowed to leave his cell for one hour each day for yard time in a six-foot-wide cage while he was in administrative segregation. MDOC's policies describe administrative segregation as the "most restrictive" type of confinement. And the jury could reasonably have disregarded the conflicting testimony from Dyer's regarding the restrictiveness of SLF's administrative segregation.

Defendants disagree and argue that the Court ruled at the summary-judgment stage that Blaylock had to prove he was mentally ill during his administrative segregation to prevail at trial. But all the Court held at the summary-judgment stage was that Blaylock had come forward with unrebutted evidence showing such illness, and therefore that the parties genuinely disputed whether his administrative segregation had been atypically and significantly hard. *See Blaylock v. Carl*, No. 22-cv-10831, 2023 WL 10369274, at *5–6 (E.D. Mich. Nov. 30, 2023) (report and recommendation), *adopted by* 2024 WL 1099896 (E.D. Mich. Mar. 13, 2024). The Court did *not* rule that a jury could not resolve this genuine dispute in Blaylock's favor unless he proved that he was mentally ill during his segregation. Stated differently, the Court did not require Blaylock to prove the protected-liberty-interest element of his claim using any specific proofs; it ruled only that a reasonable juror who construed the summary-judgment record in the light most favorable to Blaylock would find that element proven by a preponderance of the evidence.

Moreover, even if Blaylock's claim fails unless he proved at trial that he was mentally ill during his administrative segregation, he presented sufficient evidence of such illness. He testified that he took psychiatric medication before he was in MDOC custody and that he

11

believed the walls of his administrative-segregation cell were talking to him. He also presented evidence that he told an SLF officer that he was hearing voices in July 2021. Defendants cite contrary proofs that they believe show Blaylock was lying, but the Court must presume that the jury reasonably believed Blaylock. Defendants also say that Blaylock could only prove that he was mentally ill during his administrative segregation through expert testimony, but Defendants never raised this objection at trial.

*Third*, Defendants argue that Blaylock's administrative segregation was not atypically and significantly hard unless they knew that he was mentally ill when they decided to continue the segregation. This argument relies on Defendants' premise that Blaylock's segregation did not give rise to a protected liberty interest unless he was mentally ill. As discussed above, however, Defendants are wrong. Defendants also do not come forward with any caselaw holding that a prison official is immune from liability for subjecting a prisoner to atypically and significantly hard conditions of confinement unless the official had actual knowledge of the atypically and significantly hard conditions. And the stipulated jury instructions did not include any scienter element.

Defendants disagree and argue that *J.H.*, 951 F.3d at 709, supports their position. But as discussed above, *J.H.* applied *Bell*'s test for whether pretrial detention violates the Constitution and not the test at issue in this case, namely, whether a prison official's decision to continue a prisoner's atypically and significantly hard confinement violated the prisoner's due-process rights. *See id.* at 717–20. So, *J.H.* does not help Defendants.

Defendants also cite *Finley v. Huss*, which held that "an inmate's personal characteristics" such as mental illness are relevant to "determining the presence of an atypical and significant hardship." 102 F.4th 789, 815 (6th Cir. 2024). But *Finley* applied this rule to a

12

claim by a prisoner that his administrative segregation had given rise to a protected liberty interest without considering whether the prison officials who had confined the prisoner knew about his relevant personal characteristics. *See id.* *Finley* cuts against Defendants.

In sum, Blaylock proved that his administrative segregation gave rise to a protected liberty interest.

## II.     Deprivation of Protected Interest Without Due Process

Defendants also argue that even if Blaylock's administrative segregation gave rise to a protected liberty interest, he received all the process he was due. Where, as here, a prison official confines a prisoner under conditions that gave rise to a protected liberty interest, the Due Process Clause demands that the official "engage in some sort of periodic review" of the confinement and that his or her "decision to continue such confinement . . . be supported by 'some evidence.'" *Selby*, 734 F.3d at 559 (quoting *Harris*, 465 F. App'x at 484).

Here, the trial evidence showed that Defendants periodically reviewed Blaylock's administrative segregation. The SCC, of which Dyer was a member, conducted monthly reviews in September, October, and November 2021, which Carl approved. During these reviews Dyer looked at Blaylock's disciplinary record and spoke with him personally.

But the jury reasonably could have concluded that Defendants' reviews were not supported by some evidence. The jury could have entirely rejected Defendants' testimonies and concluded that their purported reviews were not supported by some evidence. The Court may not weigh the evidence. Yet Defendants ask the Court to do just that. They argue that "Dyer['s] testimony alone" speaks to what supported Defendants' periodic reviews. (Dkt. No. 99, PageID.713).

13

In short, after assessing the credibility of the witnesses, the jury could have reasonably rejected Defendants' testimony and found that although Defendants filled out periodic review forms, their reviews were a sham. Blaylock accordingly proved that Defendants' reviews were not supported by some evidence.

In sum, Blaylock proved that Defendants violated his due-process rights.

### III. Qualified Immunity

Last, Defendants argue that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity accordingly shields Defendants from this suit if: (1) the trial evidence does not show that Defendants violated his due-process rights; or (2) the right Defendants violated was not "clearly established to the extent that a reasonable person in [Defendants'] position[s] would [have] know[n] that [their] conduct complained of was unlawful." *Id.* (quoting *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011)).

As discussed above, Blaylock proved that Defendants violated his due-process rights when they confined him in administrative segregation without periodic reviews supported by some evidence. And Blaylock's right to be free from such confinement has been clearly established since at least 1995. *See Sandin*, 515 U.S. at 472. Defendants are not entitled to qualified immunity.

14

## CONCLUSION & ORDER

Blaylock proved at trial that Defendants violated his clearly-established due-process rights.  Accordingly, **IT IS ORDERED** that Defendants' motions for a directed verdict (Dkt. Nos. 95, 99) are **DENIED**.

  **IT IS SO ORDERED.**

July 11, 2025                    s/Sean F. Cox
                                  Sean F. Cox
                                  U. S. District Judge

I hereby certify that on July 11, 2025, the document above was served on counsel and/or the parties of record via electronic means and/or First-Class Mail.

s/Caitlin Shrum
Case Manager